UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| In re OFFICEMAX, INC. SECURITIES LITIGATION | Master File No. 1:00-CV-2432 |
| | CLASS ACTION |
| This Document Relates To: | Judge O'Malley<br>Magistrate Judge Vecchiarelli |
| ALL ACTIONS. | |
| | MOTION TO CLARIFY AND/OR RULE 59(e) MOTION TO AMEND COURT'S ORDER AND REQUEST FOR ORAL ARGUMENT |

## TABLE OF CONTENTS

**Page**


I. This Court Should Clarify Its Order to Specify Whether It Is With or Without Prejudice and Whether Plaintiff May File an Amended Complaint . . . . . 1

II. This Motion to Reconsider Should Be Granted and Plaintiff Should Be Given Leave to Amend Because Plaintiff Will Present New Additional Evidence in an Amended Complaint to Address Concerns Identified in This Court's Memorandum and Order . . . . 2

III. Plaintiff's New Evidence and Amended Complaint Will Address the Three General Concerns Identified in the Court's Ruling . . . . . 3

A. Plaintiff's Amended Complaint Will Provide Further Detail Regarding the Divergence of Defendants' Internal Problems and Their External Statements . . . . 3

B. The Motive Allegations Are Sufficient Under the Totality of Circumstances . . . . . 5

C. Plaintiff's Amended Complaint Will Include a More Detailed Analysis of Defendants' GAAP Violations . . . . . 6

1. Inventory Reserves . . . . . 6

2. Vendor Rebates . . . . . 6

IV. Conclusion . . . . . 8

Plaintiff respectfully submits this Request for Clarification and/or Motion to Reconsider and Request for Oral Argument.

**I. This Court Should Clarify Its Order to Specify Whether It Is With or Without Prejudice and Whether Plaintiff May File an Amended Complaint**

Plaintiff respectfully requests clarification of the Court's March 26, 2002, Memorandum and Order on defendants' motion to dismiss. The Memorandum and Order granted defendants' motion, without specifying whether the dismissal was with or without prejudice, or whether plaintiff could file an amended complaint. Moreover, it appears that no "judgment" has been entered under Fed. R. Civ. P. 58, which "requires that judgments be entered in a document that is separate from the Court's memorandum opinion." *Smith v. Hudson*, 600 F.2d 60, 62 (6th Cir. 1979); *see also Jetero Construction Co. Inc. v. South Memphis Lumber Co.*, 531 F.2d 1348, 1351 (6th Cir. 1976). Although the Court entered a one-page "Order" along with its Memorandum and Order, the Second Circuit, in particular, has explicitly held that a document titled an "order" is not a "judgment" that finally terminates an action under Rule 58. *See, e.g., Cooper v. Town of East Hampton*, 83 F.3d 31, 34 (2d Cir. 1996) ("we have consistently required that such a document must be 'separate from any judicial memorandum or opinion' and 'must be labeled a "judgment"'") (citation omitted) ;*Selletti v. Carey*, 173 F.3d 104, 109 (2d Cir. 1999) (rejecting notion "that a separate 'order' ... should be viewed as a 'judgment'"); *Kanematsu-Gosho, Ltd. v. M/T Messiniaki Aigli*, 805 F.2d 47, 49 (2d Cir. 1986). Thus, what remains unclear is whether this "Order" is intended to be a judgment that ends the case for all purposes (because the Court intended that plaintiff has no further opportunity to amend) or whether it is merely an Order (as its title states) that neither addresses nor terminates plaintiff's ability to file an amended complaint.

If, in fact, a judgment has been entered, plaintiff moves for reconsideration of the judgment pursuant to Fed. R. Civ. P. 59(e), and simultaneously requests leave to amend the complaint pursuant to Fed. R. Civ. P. 15(a).

**II. This Motion to Reconsider Should Be Granted and Plaintiff Should Be Given Leave to Amend Because Plaintiff Will Present New Additional Evidence in an Amended Complaint to Address Concerns Identified in This Court's Memorandum and Order**

If a judgment has been entered, plaintiff moves under Rule 59(e) to alter or amend the judgment. Leave to amend may be appropriate "'even after judgment,'" *Lloyd v. United Liquors Corp.*, 203 F.2d

789, 793 (6th Cir. 1953), and when leave is requested in a Rule 59(e) motion, it is "governed by the same considerations controlling the exercise of decision under rule 15(a)." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 n.1 (5th Cir. 1981); *see also Adams v. Gould, Inc.*, 739 F.2d 858, 864 (3d Cir. 1984).

Here, these considerations favor amendment as the Sixth Circuit holds that leave to amend should be ***liberally granted***. *See, e.g., Janikowski v. Bendix Corp.,* 823 F.2d 945, 951 (6th Cir. 1987). This is, of course, consistent with Rule 15(a)'s direction that "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Hence, plaintiff should be given the opportunity to amend the complaint.[1]

A judgment may be amended to permit plaintiff leave to file an amended complaint. *Isbell v. Travis Electric Co.,* No. M1999-00052-COA-R3-CV, 2000 Tenn. App. LEXIS 809, at *29 (Tenn. Ct. App. Dec. 13, 2000); *Dussuoy*, 660 F.2d at 597. A judgment may also be amended to account for new evidence, to correct a clear error of law, or to prevent manifest injustice. *Geier Brothers Farms v. Furst-McNess Co.*, No. 3:00 CV 7599, 2002 U.S. Dist. LEXIS 3249, at *6-*7 (N.D. Ohio Feb. 22, 2002). Leave to amend should be given in light of the Sixth Circuit liberal policy, favoring amendment and new evidence which would be included in an amended complaint and which justifies reconsideration of the Court's ruling. Until that ruling, the Court had not indicated what deficiencies it perceived were present in the complaint.

## III. Plaintiff's New Evidence and Amended Complaint Will Address the Three General Concerns Identified in the Court's Ruling

This Court dismissed the case, holding that plaintiff's allegations do not state with particularity facts giving rise to a strong inference of scienter. The Court held, more specifically, that the operative complaint (1) did not provide sufficient detail regarding the divergence between the internal knowledge at OfficeMax and the external statements; (2) did not provide enough detail regarding Feuer's motive to artificially inflate the price of OfficeMax, Inc.'s ("OfficeMax" or the "Company") stock; and (3) did not plead the Generally Accepted Accounting Principles ("GAAP") violations in sufficient detail.

---

[1]Further, because plaintiff has not delayed to harass defendants and because defendants will not be unduly prejudiced, no reason exists to deny leave to amend. *E.g., Bendix Corp.*, 823 F.2d at 951. And, since the Court has just issued its Order, plaintiff's request to file an amended complaint cannot be untimely – especially since the Order is silent on whether plaintiff may, in fact, amend.

## A. Plaintiff's Amended Complaint Will Provide Further Detail Regarding the Divergence of Defendants' Internal Problems and Their External Statements

Plaintiff alleges defendants made repeated optimistic statements about OfficeMax's profitability, and the efficiency of its operations, despite knowledge of massive inventory problems that plagued OfficeMax throughout the Class Period. The Court was dissatisfied that plaintiff only cited one internal report (the Salmon Study) to demonstrate defendants' internal awareness of the inventory problems. An amended complaint would support this allegation further with disclosures from former employees who are familiar with the degree and intensity of the inventory problems. Very recently, one such employee – a former Vice President employed by OfficeMax from 1992 to 2000 – has confirmed that OfficeMax engaged in the practice of disguising its true financial performance by artificially inflating income. One pervasive practice was that of improperly recognizing as income vendor rebates and allowances in the Class Period. This witness confirms that, throughout the Class Period, it was known throughout OfficeMax that it was performing dismally, and he is aware that the improper recognition of revenue from vendors' rebates and allowances increased during the Class Period to mask OfficeMax's true condition.[2]

In addition, plaintiff would add new allegations about the prevalent ***undisclosed*** cash flow problems that OfficeMax was experiencing in 1999 that contrast sharply with defendants specific representations. An amended complaint would add, for example, that:

- Several vendors actually filed lawsuits against OfficeMax for OfficeMax's failure to pay them:
    - For example, AGS, Inc. filed a collections case against OfficeMax in April 1999. At the time, OfficeMax was past due and owed AGS, Inc. at least $465,191 for stationery products;
    - Similarly, SIIG, Inc. filed a collections case in Cleveland, Ohio against OfficeMax in May 1999. OfficeMax was past due and owed SIIG, Inc. for computer peripherals. In December 1999, OfficeMax owed SIIG, Inc. at least $49,541;
    - Similarly, ORA Electronics filed a collections case against OfficeMax in November 1999. At the time, OfficeMax was past due and owed ORA Electronics at least $167,245;

---

[2] At the time of filing this motion, communications are continuing with this witness, as well as other former employees and witnesses who plaintiff believes can offer similar relevant testimony.

- Xerox refused to provide OfficeMax with any more services in early 2000 because OfficeMax had not been paying Xerox's bills in 1999;

- Plaintiffs are informed and believe that there were many other instances where OfficeMax breached payment agreements in order to make its cash-flow problems. One former OfficeMax vendor has revealed that in his region, 15-20 vendors were owed hundreds of thousands of dollars by OfficeMax in 1999 but not paid; and

- According to a former OfficeMax accounts payable supervisor (who worked at for OfficeMax from 1992-2001), Feuer was the one responsible for deciding which vendors to pay or not to pay when the 1999 cash flow problems were occurring.

Despite the obvious internal knowledge of these cash problems, OfficeMax told a different story to analysts and investors. In fact, on March 3, 1999, after having dinner with senior management from OfficeMax Gary Balter of Donaldson, Lufkin & Jenrette (which was also OfficeMax's investment banker), reported that he had been told by the OfficeMax executives that OfficeMax "is cash flow positive and should generate over $125 million in positive cash flow. ..."[3] Furthermore, despite the fact that OfficeMax was not paying its vendors (and, in fact, was being sued by several of its vendors), OfficeMax reported, for example, in its Form 10-K (filed April 8, 1999) that "[t]he Company believes that it has good relationships with its vendors." Such statements about OfficeMax's positive cash flow and vendor relations were false and misleading when made due to all the aforementioned problems.

The Court also expressed concern that the complaint somehow "concedes" that, because OfficeMax was trying to remedy its inventory problems, the allegations concerning concealment of those problems are diminished. But plaintiff identifies the attempted remedies to demonstrate OfficeMax's ***awareness*** of the degree of the inventory problems. The former Vice President referred to above confirmed that overbuying to make numbers was encouraged by Feuer and was continuing throughout the Class Period. This is certainly not consistent with any attempts to remedy an inventory problem, nor likely to aid the remedial efforts. Further, as just described, OfficeMax was also experiencing cash flow problems in 1999. It was with awareness of at least these two major problems that OfficeMax continued to make its optimistic statements throughout the Class Period. Plaintiff should be permitted to amend in order to add further factual support for these claims.

---

[3]This Report also encouraged investors "to take a fresh look at OfficeMax Stock" because the "investment story at this time is compelling."

The Court also identifies chronological inconsistencies in the complaint. To the extent there are such inconsistencies, these can be addressed by restructuring portions of the complaint. For example, the Court notes that plaintiff identifies the "flat rate discount program" as a "true but concealed fact" under a section discussing a time period which pre-dates the program. Memorandum and Order at 29. To the extent this and other allegations present inconsistencies in plaintiff's complaint, plaintiff will restructure accordingly. These inconsistencies should, at most, be grounds for permitting plaintiff to amend – not grounds for dismissal with prejudice.

**B. The Motive Allegations Are Sufficient Under the Totality of Circumstances**

The Court was dissatisfied with plaintiff's allegations regarding Feuer's motive, but the Court did note that "[m]otive is but one factor, in the totality of circumstances, which the Court must consider." Memorandum and Order at 26 n.7. Here plaintiff alleges that defendants had ***actual knowledge*** about huge inventory problems (and will additionally allege that OfficeMax had undisclosed cash flow problems throughout the Class Period) which defendants should have disclosed. Furthermore, the former Vice President referred to above confirms plaintiff's allegations of GAAP violations.

Because of the totality of these circumstances, it is not necessary to rely solely on plaintiff's allegations of motive to establish scienter, as the Court recognizes. It is only fair to permit plaintiffs the opportunity to further demonstrate the falsity of defendants' statements and their awareness of that falsity. The more successful plaintiffs are with these allegations, the less relevant "motivation" becomes.

**C. Plaintiff's Amended Complaint Will Include a More Detailed Analysis of Defendants' GAAP Violations**

The Court held that the Amended Complaint failed to identify sufficient red flags with respect to inventory reserves and that the allegations in the Amended Complaint regarding the vendor rebate scheme were conclusory. Memorandum and Order at 31-32. Plaintiff's new amended complaint will cure these concerns. The amended complaint will contain new investigative results, including statements by former OfficeMax executives, which demonstrate involvement of OfficeMax's top management in the accounting manipulations. The former Vice President referred to above, who held his position during the Class Period, has stated that the mentality at that time at the Company was "***make the numbers today and make the sales the next quarters, but the sales never came, it was almost like kiting***."

**1. Inventory Reserves**

The amended complaint will contain additional red flags that hammered home the fact to OfficeMax management that it had excess and obsolete inventory that would have to be written off at some point. Store managers have recently informed plaintiff's counsel that OfficeMax, during the Class Period, had inventory that was three and four years old and that this inventory was in the back of stores where it could not be sold. Other former OfficeMax employees report that OfficeMax rarely marked down inventory when it first became obsolete. The combination of these conditions contributed to the $83 million write-down OfficeMax belatedly recorded. Plaintiff will further demonstrate the materialty of the failure to record adequately OfficeMax's inventory reserves.

**2. Vendor Rebates**

The amended complaints will contain more specificity regarding OfficeMax's practice of overbuying inventory to improve the bottom line. The amended complaint will better explain the connection between OfficeMax's practice of overbuying inventory in order to generate current period rebate income and its excessive inventory. It will explain that the efforts by the defendants to meet earnings estimates included buying excess inventory to generate rebate income and that this practice exacerbated the excess inventory situation at the Company; that this action (which was inconsistent with honest business practices) was part of a culture which placed meeting this quarter's earnings estimates ahead of the long-term health of the Company. As the former Vice President has recently told plaintiff's counsel, management was not "living for the long term," and "inventory turnover was terrible in stores, but to make the numbers, extra merchandise was purchased so that volume rebates could be taken into earnings."

The amended complaint will also show the difference between OfficeMax's treatment of vendor rebates and that of its competitors. According to former employees of OfficeMax, the Company recorded vendor rebates at the time the inventory was ***purchased***, to wit, "vendor allowances went towards numbers and the allowances went to the bottom line." Competitors did not account for the rebates in that manner. Office Depot, stated in its 1999 Annual Report that:

> Amounts we expect to receive from our vendors that relate to our purchase of merchandise inventories are capitalized and recognized as a reduction of our cost of goods sold as the merchandise is ***sold***.[4]

Thus, Office Depot essentially considered the rebates an offset against the cost of inventory, thereby matching the income from rebates with the corresponding inventory. OfficeMax, on the other hand, considered the rebate current period income, not matched to the cost of inventory from which the rebate was derived.

Moreover, the continued use of vendor rebates to inflate income without inventories being adversely affected was contrary to defendants' representation to analysts in early March 1999, that OfficeMax would be able to maintain its "vendor support" at least at then current levels even as inventory declined.

The amended complaint will also have more details on the vendors involved in vendor rebates, including customers not previously alleged such as Sharp, Panasonic, Brother, Sanyo and Canon. OfficeMax had a vendor summit every year, which internally was called a "vendor stick-up" since OfficeMax used the occasion to push for larger and larger rebates, which could be used to increase current period income. The 1999 vendor summit was held at the Cleveland Art Museum.

## IV. Conclusion

For the foregoing reasons, plaintiff requests that the Court should clarify and/or amend its order to express that plaintiff be permitted to amend the complaint within 30 days of the granting of plaintiff's motion.

DATED: April 9, 2002

Respectfully submitted,

THE LANDSKRONER LAW FIRM, LTD.

s/ Jack Landskroner
JACK LANDSKRONER (0059227)
55 Public Square, Suite 1040
Cleveland, OH 44113
Telephone: 216/241-7000

Liaison Counsel

[4]This is consistent with the guidance of Montgomery's Auditing, referenced in the complaint.

MILBERG WEISS BERSHAD
HYNES & LERACH LLP
WILLIAM S. LERACH
MARK SOLOMON
STEPHEN P. POLAPINK
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: 619/231-1058

Lead Counsel for Plaintiffs

N:\DOCS\JACK\OfficeMax\Pleadings\Motion to Clarify April 9 2002.wpd

## CERTIFICATE OF SERVICE

This is to certify that a copy of *Motion to Clarify and/or Rule 59(e) Motion to Amend Court's Order and Request for Oral Argument* has been sent to the following, by either electronic mailing or U.S. mail, postage prepaid, this 9th day of April, 2002:

*Counsel for Plaintiff(s)*

Mark Solomon
Frederick B. Burnside
Darren Robbins
William S. Lerach
Stephen P. Polapink
MILBERG WEISS BERSHAD HYNES & LERACH, LLP
600 West Broadway, Suite 1800
San Diego, CA 92101-5050
*Served via Electronic Mailing*

*Counsel for Defendant(s)*

Daniel P. Mascaro
James R. Wooley
Marcia E. Marsteller
BAKER & HOSTETLER, LLP
3200 National City Center
1900 East 9th Street
Cleveland, OH 44114
*Served via Electronic Mailing*

Roger G. Brooks
Robert S. Rifkind
Avita Wertheimer
Cravath, Swaine & Moore
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

s/Jack Landskroner
JACK LANDSKRONER #0059227
THE LANDSKRONER LAW FIRM, LTD.